**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| ROOSEVELT BRADLEY AND KAREN BLACHOWICZ, <br><br> Plaintiffs, <br><br> v. <br><br> MANDUKA LLC, <br><br> Defendant. | Civil Action No. 2:25-cv-521 <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF

ROOSEVELT BRADLEY AND KAREN BLACHOWICZ ("Plaintiffs"), by and through undersigned counsel, seeks a permanent injunction requiring a change in MANDUKA LLC's ("Manduka" or "Defendant") corporate policies to cause its digital properties to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

## INTRODUCTION

1.      This action arises from Defendant's failure to make its digital properties accessible to legally blind individuals, which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189, N.Y. Exec. Law § 290, *et seq.*, and the laws of the State of New York.

2.      It is estimated that 2.5 percent of the American population lives with some sort of visual disability. *See* Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), *available at*  https://www.disabilitystatistics.org/acs-custom? (last accessed November 12, 2025).

1

3.      For this significant portion of Americans, accessing digital platforms, mobile applications, and other information via their computers and smartphones has become critical, especially in the post-pandemic era. Since the pandemic, U.S. e-commerce has continued to grow, with 12 million new users choosing to shop online since 2020.[1] According to a recent study, e-commerce increased by 25% from $516 billion (11.1% of total retail sales) to $644 billion (14.2% of total retail sales).[2] This underscores the importance of access to online retailers.

4.      During these challenging times, disabled individuals rely heavily on acquiring goods and services from the internet. With more businesses choosing to market their goods and services on their online platform, access to the website is vital. Sir Tim Berners-Lee, the founder of the World Wide Web, wrote, "The power of WWW is in its universality. Access by everyone regardless of disability is an essential aspect."[3]

5.      At the same time, the share of Americans who own smartphones has climbed from just 35% in 2011 to 81% in 2019—amounting to more than 265 million people in the United States. *See* U.S. Census Bureau, U.S and World Population Clock, *available at* https://www.census.gov/popclock/ (last accessed November 12, 2025) (U.S. population on September 18, 2023 was 325.4 million).

6.      In this climate, it is especially important to consider factors that can facilitate or impede technology adoption and use by people with disabilities. National Council on Disability,

---

[1] *See* Statista, Number of users of e-commerce in the U.S. 2018-2027, available at https://www.statista.com/statistics/273957/number-of-digital-buyers-in-the-united-states/ (last accessed November 12, 2025).

[2] *See* National Library of Medicine, *Online shopping continuance after COVID-19, available at https*://www.ncbi.nlm.nih.gov/pmc/articles/PMC9379614/ (last accessed November 12, 2025).

[3] *See* Forbes, *Covid Reminds Us That Web Accessibility Helps All Users, Not Just The Disabled, available at* https://www.forbes.com/sites/gusalexiou/2020/08/23/covid-reminds-us-that-web-accessibility-helps-all-users-not-just-the-disabled/?sh=6b67ed7a6df1 (last accessed November 12, 2025).

*National Disability Policy: A Progress Report* (Oct. 7, 2016), *available at* https://files.eric.ed.gov/fulltext/ED571831.pdf (last accessed November 12, 2025).

7.      Properly formatted, digital content is universally accessible to everyone. But when it is not, ineffective communication results. In those situations, legally blind individuals must unnecessarily expend additional time and effort to overcome communication barriers sighted users do not confront. These barriers may require the assistance of third parties or, in some cases, may deny outright access to the online service. *See* Kasey Wehrum, Inc., *Your Digital Platform is Scaring Customers Away. 5 Easy Ways to Fix It* (Jan. 2014), *available at* https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-online-customers-to-complete-purchase.html (last accessed November 12, 2025).

8.      Screen access "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use digital platforms. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a digital platform by listening and responding with his keyboard.

*Id*. at *6-7.[4]

---

[4]     *See* American Foundation for the Blind, *Screen Readers*, *available at*

9.      As an increasingly common—albeit ineffective—measure is the use of accessibility overlay software tools ("Accessibility Overlays"). These "third party scripts . . . try to detect and fix accessibility problems through AI or machine learning, taking a guess at the high-level tags and attributes, and then injecting code to fix things like adding alt attributes." American Foundation for the Blind, Accessibility Overlays: Promises and Pitfalls, available at https://www.afb.org/blog/entry/accessibility-overlay-promises-and-pitfalls (last accessed July 8, 2025).

10.     Accessibility Overlays purport to "guarantee that your website will be 100% ADA and WCAG 2.1 compliant" but "often miss more than 70% of WCAG guidelines which can only be assessed through manual testing." *Id.*

11.     Even more concerning is that, although these Accessibility Overlays promise a "quick fix," they will "often override the settings of users' existing assistive technology software, which makes things more difficult and complicated for the [screen reader] user." *Id.*

12.     Consistent with these failures, the Federal Trade Commission ("FTC") recently issued a final Decision and Order finding that one Accessibility Overlay vendor has repeatedly claimed that it delivers a fully accessible digital experience but failed to fulfill such claims. As part of its findings, the order mandates the Accessibility Overlay vendor to pay the FTC $1,000,000 in monetary relief that may be used to provide refunds to its' consumers. *See* Decision and Order, AccessiBe Inc., et al. § VI-VII, FTC Docket No. C-4817 (April 21, 2025).

13.     Moreover, the Accessibility Overlay vendor must engage in numerous remedial efforts to address its previous representations concerning its overlay product, including a

---

https://www.afb.org/node/16207/screen-readers (last accessed November 12, 2025) (discussing screen readers and how they work).

prohibition against "mak[ing] any representation . . . the such product or service . . . can make any website compliant with WCAG . . . [or] ensure continued automatic compliance with WCAG over time as website content changes . . . unless the representation is non-misleading, including that, at the time such representation is made, they possess and rely upon competent and reliable evidence." *See Id.*, § 1.

14.     The United States Department of Justice Civil Rights Division has provided "Guidance on Web Accessibility and the ADA."[5] It states in part, "the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."

15.     Unfortunately, here Defendant fails to communicate effectively with Plaintiffs because its digital properties are not properly formatted to allow legally blind users such as Plaintiffs to access its digital content. Accordingly, legally blind customers such as Plaintiffs are deprived from accessing information about Defendant's products and using its online services, all of which are readily available to sighted customers.

16.     This lawsuit is aimed at providing legally blind users like Plaintiffs Bradley and Blachowicz a full and equal experience.

## PARTIES

17.     Plaintiff Bradley is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.* Plaintiff has been totally blind since he was nine years old due to a tumor on his optic nerve. Plaintiff uses an iPhone 12 to navigate the

---

[5]    *See* ADA.Gov, *Guidance on Web Accessibility and the ADA*, *available at* https://www.ada.gov/resources/web-guidance/ (last accessed November 12, 2025) ("DOJ Guidance").

internet, as well as a Windows personal computer with the JAWS screen-reading application and a Mac computer with Voiceover. Plaintiff Bradley is, and at all times relevant hereto has been, a resident of Crown Point, Indiana.

18.    Plaintiff Blachowicz is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*. Plaintiff Blachowicz has retinitis pigmentosa, a degenerative retinopathy disease which has progressed over many years. She suffered a stroke in 2014, which sped up the degenerative process significantly. Plaintiff Blachowicz uses an iPhone and a desktop computer which utilizes JAWS. Plaintiff Blachowicz is a businesswoman who received a certification from Haughton College in 2009 in managing nonprofit organizations. Plaintiff Blachowicz is, and at all times relevant hereto has been, a resident of Buffalo, New York, located in Erie County.

19.    Defendant is a Delaware limited liability company with its principal place of business located at 129 Nevada Street. Defendant is a leader in the design, development, manufacture, and distribution of yoga mats, accessories, apparel, and other related products under its recognized brand name Manduka.

20.    Consumers may purchase Defendant's products and access other brand-related content and services at https://www.manduka.com/ ("Digital Platform"), the Digital Platform Defendant owns, operates, and controls.

21.    In addition to researching and purchasing Defendant's products and services from the comfort and convenience of their homes, consumers may also use Defendant's Digital Platform to contact customer service by email, sign up to receive product updates, product news, and special

promotions, review important legal notices like Defendant's Privacy Policy and Terms and Conditions, and more.[6]

22.    Defendant is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

23.    Because Defendant's Digital Platform is not and has never been fully accessible, and because upon information and belief Defendant does not have, and has never had, adequate corporate policies that are reasonably calculated to cause its digital properties to become and remain accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seek prospective injunctive relief requiring Defendant to:

a)    Retain a qualified consultant acceptable to Plaintiffs ("Web Accessibility Consultant") who shall assist in improving the accessibility of its Digital Platform, including all third-party content and plug-ins, so the goods and services on the Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities;

b)    Work with the Web Accessibility Consultant to ensure all employees involved in Digital Platform and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c)    Work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d)    Work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on Digital Platforms, in addition to the testing, if applicable, that is performed using semi-automated tools;

e)    Incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

---

[6]    *See, e.g.*, Defendant's Home Page, *available at* https://www.manduka.com/.

f)  Work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Digital Platform, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g)  Directly link from the footer on each page of its Digital Platform, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Digital Platform to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Digital Platform;

h)  Accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i)  Provide a notice, prominently and directly linked from the footer on each page of its Digital Platform, soliciting feedback from visitors to the Digital Platform on how the accessibility of the Digital Platform can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)  Provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Digital Platform;

k)  Train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Digital Platform. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)  Modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to be inaccessible to users of screen reader technology;

m) Plaintiffs, their counsel, and their experts monitor the Digital Platform for up to two years after the Mutually Agreed Upon Consultant validates the Digital Platform is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Digital Platform Accessibility Consultant provides Defendant.

8

24. Digital platforms have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible digital platform will not cause the digital platform to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible digital platform has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the digital platform to remain accessible, the digital platform must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

25. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C.A. § 1367 and 42 U.S.C. § 12188.

26. Defendant participates in the State of Indiana and the State of New York's economic life, respectively, by transacting significant business over the Internet. Through its Digital Platform, Defendant entered contracts for the sale of its products and services with residents of Indiana and New York. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Hetz v. Aurora Med. Ctr. of Manitowoc Cnty.*, No. 06-C-636, 2007 U.S. Dist. LEXIS 44115, at *6 (E.D. Wis. June 18, 2007); *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (upholding jurisdiction over magazine publisher that had "continuously and deliberately exploited" the market in forum state); *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 427 & n. 1 (7th Cir.2010) (finding that defendant's advertising in and Internet contacts with Illinois were sufficient to support personal jurisdiction).

27.     This court may exercise supplemental jurisdiction over any claim that is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Plaintiff Blachowicz's claim under N.Y. Exec. Law § 296, *et seq.*, is such a claim.  The Seventh Circuit has interpreted the language of § 1367(a) to require only a "loose factual connection between the claims." *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995). As such, this Court may exercise "judicial power to hear both state and federal claims . . . where the federal claim has sufficient substance to confer subject matter jurisdiction on the court, and the state and federal claims derive from a common nucleus of operative facts." *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) (*citing United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725 (1966)).

28.     Plaintiffs were injured when they attempted to access Defendant's Digital Platform from their homes in this district, and Buffalo, New York, respectively, in an effort to shop for Defendant's products but encountered barriers that denied them full and equal access to Defendant's online goods, content, and services. Plaintiff Bradley desired to purchase the men's casual hoodie in phantom. Plaintiff Blachowicz wanted to purchase the sanctuary yoga towel. Unfortunately, they were unable to complete their purchases due to the accessibility barriers which exist on Defendant's Digital Platform.

29.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff Bradley's claims occurred.

## FACTS APPLICABLE TO ALL CLAIMS

30.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with

perceptual or motor disabilities, digital platform developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

<u>**DEFENDANT'S ONLINE CONTENT**</u>

31.    Defendant's Digital Platform allows consumers to research and participate in Defendant's services and products from the comfort and convenience of their own homes.

32.    The Digital Platform also enables consumers to contact customer service by phone, email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy Policy and Terms of Service, and more.

33.    Consumers may use the Digital Platform to connect with Defendant on social media, using sites like Facebook, Instagram, Pinterest, YouTube, and X (formerly known as Twitter).

<u>**HARM TO PLAINTIFFS**</u>

34.    Plaintiffs attempted to access the Digital Platform from their homes in this judicial district, and Buffalo, New York, respectively, to purchase a men's hoodie and yoga towel. Unfortunately, because of Defendant's failure to build the Digital Platform in a manner that is compatible with screen access programs, Plaintiff is unable to understand, and thus are denied the benefit of, much of the content and services they wish to access on the Digital Platform. The following are illustrative (but, importantly, not exhaustive) examples of a few of the accessibility barriers observed on the Digital Platform:

a.    There are significant focus order issues encountered on the site, which disrupt navigation and make content inaccessible. The navigation menu is not accessible. The 'Menu' button does not come into focus when swiping through the navigation region, nor does it

11

come into focus at any other point. With the screen reader turned off, users can tap the 'Menu' button to access the navigation menu. While swiping through the home page, a promotional pop-up window is displayed, and its 'Close' button is immediately given focus. If the 'Close' button is then selected, the pop-up closes, but focus automatically moves to the site's scroll bar. The next swipe then moves focus immediately to the toolbar, preventing access to the remainder of the site.





b.      The 'Notify Me' pop-ups are not accessible. When the 'Notify Me When Available' button is selected on a product page, a 'Notify Me' pop-up is displayed, but it is not announced or given focus. Instead, swiping continues focus on the underlying page after it appears. The user must swipe through the remainder of the underlying page and footer links before the pop-up comes into focus, which takes over 200 swipes. Additionally, on some product pages, the 'Notify Me When Available' button is not properly labeled. For example, the 'Notify Me When Available' button on the 'Commuter Mat Carrier' product page was announced only as "number sign button." As a result, the screen reader user would not know the purpose of the button, nor would they be able to access the 'Notify Me' pop-up that opens when it is selected.



c.        There are unlabeled elements are present. Graphic links on the home page

are not given meaningful labels. For example, the 'Hot Yoga' graphic link is announced as "four

people in a yoga class practice Utkatasana (chair pose) with arms raised button main landmark." The user does not know the role, purpose, or destination of this link as it is incorrectly announced as a "button" and given a meaningless label. Similarly, the 'Yoga Towels' graphic link is announced as "man with curly blonde hair and tattoos on arms does a plank on a yoga mat link image list start." The image description does not accurately convey the purpose or destination of the link. Buttons in the footer are not announced as interactive elements. Instead, these are announced as only text. Users simply hear "customer care" instead of "customer care collapsed button." Collapsed buttons on product pages are also not labeled. For example, the 'Specs' and 'Use & Care' buttons are announced only as "menu button menu pop-up collapsed," which provides no meaningful context.





 

35.    In addition, a third-party digital accessibility expert has independently confirmed the accessibility errors on Defendant's Digital Platform.

36.    Moreover, Defendant utilizes an Accessibility Overlay on its Digital Platform.

37.    These barriers, and others, deny Plaintiffs full and equal access to all of the services the Digital Platform offers, and now deter them from attempting to use the Digital Platform to buy Defendant's goods and services. Still, Plaintiffs would like to, and intend to, attempt to access the Digital Platform in the future to research the products and services the Digital Platform offers and/or to test the Digital Platform for compliance with the ADA.

38.    If the Digital Platform was accessible, *i.e.*, if Defendant removed the access barriers, Plaintiffs could independently research and purchase Defendant's products and access its other online content and services.

39.    The law requires that Defendant reasonably accommodate Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

40.    Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

## SUBSTANTIVE VIOLATIONS

### COUNT ONE – PLAINTIFFS BRADLEY AND BLACHOWICZ

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

41.    The assertions contained in the previous paragraphs are incorporated by reference.

42.    Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.

43.    Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities. 28 C.F.R. § 303(c). *See also* DOJ Guidance (stating "[s]ince 1996, the Department of Justice has consistently taken the position that the ADA applies to web content.")

44.    Plaintiffs Bradley and Blachowicz are legally blind and therefore are individuals with a disability under the ADA.

45.    Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment." 42 U.S.C. § 12181(7)(E), (F).

46.    Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182; 28 C.F.R. § 36.201.

47.    Defendant owns, operates, or maintains the Digital Platform.

48.    The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendant.

49.    Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. *See also* DOJ Guidance (explaining "[b]usinesses open to the public must take steps to provide appropriate communication aids and services (often called "auxiliary aids and services") where necessary to make sure they effectively communicate with individuals with disabilities.")

50.    Specifically, "[e]ven though businesses and state and local governments have flexibility in how they comply with the ADA's general requirements of nondiscrimination and effective communication, they still must ensure that the programs, services, and goods that they provide to the public—including those provided online—are accessible to people with disabilities." DOJ Guidance.

## COUNT TWO – PLAINTIFF BLACHOWICZ

### Violation of New York State Human Rights Law,

### Exec. Law, Article 15 § 290, *et seq*.

51.    The assertions contained in the previous paragraphs are incorporated by reference.

52.    Defendant's Digital Platform is a place of public accommodation within the definition of Article 15 of New York Executive Law, § 292. *See Andrews v. Blick Art Materials, Inc.*, 268 F. Supp. 3d 381, 398-99 (E.D.N.Y. 2017) (concluding a website is a public accommodation under New York State's Human Rights Law.)

53.    In the broadest terms, New York's Human Rights Law prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. Since Defendant does not provide Plaintiff Blachowicz with full and equal access to its Digital Platform, it has violated Article 15.

54.    More specifically, N.Y. Exec. Law § 296(2)(a) provides that it is "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation … because of the … disability of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

55.    Defendant is subject to New York Human Rights Law because it owns and operates the Digital Platform. Defendant is a person within the meaning of N.Y. Exec. Law § 292(1).

56.    Defendant is violating N.Y. Exec. Law § 296(2)(a) in refusing to update or remove access barriers to its Digital Platform, causing its Digital Platform to be inaccessible to the visually impaired. This inaccessibility denies visually impaired consumers full and equal access to the facilities, goods and services that Defendant makes available to the non-disabled public.

57.    Specifically, under N.Y. Exec. Law § 296(2)(c)(I), unlawful discriminatory practice includes, "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations."

58.    In addition, under N.Y. Exec. Law § 296(2)(c)(II), unlawful discriminatory practice includes, "a refusal to take such steps as may be necessary to ensure that no individual with a

disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden."

59.     Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's Digital Platform or result in making the Digital Platform different, but enables individuals with visual disabilities to access the Digital Platform Defendant already provides. This will not cause an undue burden on Defendant.

60.     Defendant's actions constitute willful intentional discrimination against Plaintiff Blachowicz on the basis of a disability in violation of the New York State Human Rights Law, N.Y. Exc. Law § 296(2) in that Defendant has:

      a.   constructed and maintained a Digital Platform that is inaccessible to Plaintiff Blachowicz, as a visually-impaired New York resident, with knowledge of the discrimination; and/or

      b.   constructed and maintained a Digital Platform that is not sufficiently intuitive and/or obvious such that is inaccessible Plaintiff Blachowicz, as a visually-impaired New York resident; and/or

      c.   failed to take actions to correct these access barriers in the face of substantial harm and discrimination to Plaintiff Blachowicz, as a visually-impaired New York resident.

61.     Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

62.     As such, Defendant discriminates, and will continue in the future to discriminate against Plaintiff on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations, and/or opportunities of https://www.manduka.com/ under § 296(2), *et seq.,* and/or its implementing regulations. Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff Blachowicz will continue to suffer irreparable harm.

63.     The actions of Defendant were and are in violation of New York State Human Rights Law and therefore Plaintiff Blachowicz invokes his right to injunctive relief to remedy the discrimination.

64.     Plaintiff Blachowicz is also entitled to compensatory damages, as well as civil penalties and fines pursuant to N.Y. Exc. Law § 297(4)(c), *et seq.,* for each and every offense.

65.     Plaintiff Blachowicz is also entitled to reasonable attorneys' fees and costs.

66.     Pursuant to N.Y. Exec. Law § 297 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

## PRAYER FOR DECLARATORY JUDGMENT AND PROSPECTIVE INJUNCTIVE RELIEF

WHEREFORE, Plaintiffs pray for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, N.Y. Exec. Law § 290, *et seq*., and the laws of the State of New York, in that Defendant took no action that was reasonably calculated to ensure that its Digital Platform was fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a), N.Y. Exec. Law § 290, *et seq*., and the laws of the State of New York, which directs

21

Defendant to take all steps necessary to bring its Digital Platform into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law, including the specific prospective injunctive relief described more fully in paragraph 23 above.

(C)    Payment of costs of suit;

(D)    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. LAX World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(E)    Payment of compensatory damages pursuant to N.Y. Exec. Law § 290, *et seq.*;

(F)    Payment of nominal damages;

(G)    The provision of whatever other relief the Court deems just, equitable and appropriate; and

(H)    An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders in regard to the specific prospective injunctive relief described at paragraph 23 above.

Dated: November 12, 2025                    Respectfully Submitted,


                                            */s/ Benjamin J. Sweet*
                                            Benjamin J. Sweet (PA Bar ID 87338)
                                            ben@nshmlaw.com
                                            **NYE, STIRLING, HALE, MILLER, &
                                            SWEET LLP**
                                            101 Pennsylvania Boulevard, Suite 2
                                            Pittsburgh, Pennsylvania 15228
                                            Phone: (412) 857-5350

                                            Jonathan D. Miller (CA Bar ID 220848)
                                            jonathan@nshmlaw.com
                                            **NYE, STIRLING, HALE, MILLER, &
                                            SWEET LLP**
                                            33 W. Mission Street, Suite 201
                                            Santa Barbara, California 93101
                                            Phone: (805) 963-2345

                                            *Attorneys for Plaintiffs*